# Mark J. Williams, LCSW

Mitigation Specialist / Advocate

---



Mark. W Consultancy

PO Box 731 - Far Hills, NJ

[mjwwill@aol.com](mailto:mjwwill@aol.com)

973.270.7840

**PRIVILEGED FORENSIC WORK PRODUCT**

_____

**Psychosocial Mitigation Impression**

**December 13, 2018**

**Re: Mr. William Nelson**

**UNITED STATES DISTRICT**

**for the**

**Eastern District of New York**

**United States of America**

**v.**

**WILLIAM NELSON**

*Defendant*

**Case No. / CR 17 – 394**

_____

The following psychosocial report is based on my extensive face to face interviews over the past year with defendant, Mr. William Nelson, age 45 years (DOB: 7/25/1973) as well as with his family members including his wife, Janelle, age 45 years; father, William, age 69 years; mother, Marianne, age 66 years; sister, Kristin, age 36 years (divorced), her fiancé, James, age 37 years; brother, Brian, age 39 years, his wife, Estee, age 40 years; uncle, Timothy, age 63 years (the younger brother of Bill's mother, a gay man whose partner of many years had recently passed when I met him in early 2018).

I have had the privileged of getting to know defendant and his immediate family as directed by his defense counsel, Mr. Patrick J. Brackley, Esq., 233 Broadway, Suite 2370, New York, New York, 10279, so I could provide the court with a comprehensive mitigation summary based on family history and furthermore indicate my clinical diagnostic impression of defendant and offer recommendation for his rehabilitation.

For purposes of this report, I will refer to the defendant as *Bill*. Using the name most familiar with any person is critical to build and sustain a level of trust. Throughout my time spent with *Bill,* I sought to understand his background, developmental history, cultural concerns, level of understanding of the legal disciplinary measures related to his behavior, the presentation of any remorse, factors that may have affected *Bill's* decision making ability, efforts towards and openness for rehabilitation and risk factors for the future. I seek such an in-depth understanding of a defendant as my clinical opinions require knowledge of, and an appreciation for, each person's unique history. To set the

tone for this mitigation evaluation, I have used the Adverse Childhood Experience (ACE) examination, which follows next, providing essential context to best understand *Bill,* in particular regarding his early development before adulthood.

**ADVERSE CHILDHOOD EXPERIENCE (ACE) QUESTIONNAIRE \*\***

**(administered to defendant by author)**

While you were growing up, during your first 18 years of life:

1) Did a parent or other adult in the household often... swear at you, insult you, put you down, or humilitate you? or Act in a way that made you afraid that you might be physically hurt? Yes - No / If yes enter 1 = **1**

2) Did a parent or other adult in the household often ... push, grab, slap, or throw something at you? or Ever hit you so hard that you had marks or were injured? Yes - No / If yes enter 1 = **1**

3) Did an adult or person at least 5 years older than you ever... Touch or fondle you or have you touch their body in a sexual way? or Try to or actually have oral, anal, or vaginal sex with you? Yes – No / If yes enter 1 = **0**

4) Did you often feel that ... No one in your family loved you or thought you were important or special? or Your family didn't look out for each other, feel close to each other, or support each other? Yes – No / If yes enter 1 = **1**

5) Did you often feel that... You didn't have enough to eat, had to wear dirty clothes, and had no one to protect you? or Your parents were too drunk or high to take care of you or take you to the doctor if you needed it? Yes – No / If yes enter 1 = **0**

6) Were your parents ever separated or divorced? Yes – No / If yes enter 1 = **0**

7) Was your mother or stepmother: Often pushed, grabbed, slapped, or had something thrown at her? or Sometimes or often kicked, bitten, hit with a fist

3

or hit with something hard? or Ever repeatedly hit over at least a few minutes or threatened with a gun or knife? Yes – No/ If yes enter 1 = **0**

8) Did you live with anyone who was a problem drinker or alcoholic or used street drugs? Yes – No / If yes enter 1 = **0**

9) Was a household member depressed or mentally ill or did a household member attempt suicide? Yes – No / If yes enter 1 = **1**

10) Did a household member go to prison? Yes – No / If yes enter 1 = **0**

---

Total score for defendant, Mr. Nelson = **4** * an Ace score of 4 or more underscores a significant trauma background during critical developmental, formative years (up to 18 years) putting one at very high risk to have psychological dysfunction and even physical ailments including premature death when adulthood sets in, often marked by periods of inappropriately *acting out*, often characterized by drinking alcohol excessively, the use of illicit drugs, the manifestation of other addictive behaviors associated with gambling, sex, shopping, or the like, even the exhibition of criminal activity patterns. *Bill's* profile, reaching a 40% score, demonstrates traumatic precipitating factors he experienced which played a part in his criminal behavior later in life.

(** Shonkoff J and Gardner A, (2012), The life-long effects of early childhood adversity and toxic stress, Pediatrics; 129; e232. Vander Kolk, BA (2014); The body keeps the score: Brain, mind and body in the healing of trauma. Penguin Random House, New York, NY 10014. American Journal of Preventative Medicine 1998; relationship of childhood abuse and household dysfunction to many leading causes of mental health disorders, physical ailments including death in adults: the adverse childhood experiences (ACE) study.

---

# EARLY DEVELOPMENTAL / FAMILY, ACADEMIC & WORK HISTORY

William (*Bill*) Nelson, is a married, father of 3 children, Caucasian male (45 years) of Irish, Swedish and German descent who was born in the Bay Ridge section of Brooklyn, NY at Victory Memorial Hospital on July 25, 1973.  Early on he was diagnosed with ADHD;  he was an above average student academically from elementary through high school, having attended all Roman Catholic schools.  What excited *Bill* the most was his participation in theatre in high school (Xaverian H.S.) in Brooklyn and being influenced by the head of the drama department there, Brother Clement.  This experience led him to thinking about a career in either architecture and/or photography. Bill enjoyed - immensely - being part of the stage crew, supporting the dramas and musicals all four years of high school.  As well, he became a student representative of Amnesty International, demonstrating an early interest in service work. Despite coming from a very dysfunctional family system where physical and emotional abuse were commonplace, *Bill* had a reputation of being a nice and good kid who would take the shirt off his back to help others.  However, what was being masked was a deep anxiety he felt often.  *Bill* tried college for a few years (New York Institute of Technology) with dreams of becoming an architect since he was so good with his hands and design (from his stage crew exposure) but dropped out after a part-time job at the New York Public Library turned into a full-time role in the Purchasing Department, his real first entry into the procurement world, an area which would eventually be tied to his downfall (arrest) several years later when he had been employed at The Richmond County District Attorney's Office (Staten Island, NY), a government agency.  From all the emotional and physical abuse he faced during his formative years, up to the time of his arrest, *Bill* was always searching for a way to feel a stronger connectedness and sense of well-being. From the outside, he seemed to have it made... fine marriage, beautiful children, solid employment with history of stellar performance reviews, respected citizen and volunteer in the community (e.g., scoutmaster).  However, *Bill* had a hole in his soul and he tried to fill it materially, by buying and buying and buying, so many things and quite unfortunately, illegally with the misuse of the organization's corporate credit card and other digital methods since *Bill* was the keeper of all the business account information in his capacity as head of procurement.  What he did not know, until he hit bottom from the arrest, was that he was an addict, a *shopaholic*, who was suffering from a profound addictive illness that was years in the making.  Like any addiction, it is a progressive disease.  And, addicted persons are as sick as their secrets.  This is, unquestionably, the case for Bill.  Getting caught was the best possible medicine he could have gotten, notwithstanding possible incarceration and significant financial restitution.

**PSYCHOLOGICAL & MEDICAL HISTORY / DIAGNOSTIC IMPRESSION**

*Bill,* remarkably, does not experience severe, debilitating psychological dysfunction at this time considering the upbringing he has had, especially with all the emotional and physical abuse he endured (father towards defendant). *Bill's* father came from an abusive background himself and simply carried his own unresolved psychological dysfunction into his own marriage and family of three children. During their upbringing, he hit both *Bill* and brother *Brian,* not sister *Kristin* or mother, *Marianne*. A belt, hanger, ruler were examples of objects used to cause physical harm to his sons. Screaming and cursing towards all was par for the course; verbal assaults were constant in the immediate family system. In his twenties, *Bill* began to experience severe anxiety with occasional panic attacks. *Brian* started to drink heavily (he is an alcoholic) in his twenties and *Kristin*, also in her twenties, developed significant obsessive compulsions like always wanting to clean and straighten up. *Marianne* became more withdrawn in the marriage and mildly depressed. All these behaviors are directly linked to early trauma and the continuation thereof.

Most significantly, *Bill* started to enjoy shopping and buying material things and piling up "stuff", as it were, even if he didn't need it. This uncontrollable, compulsive buying just kept building and building, not unlike alcohol, often characterized by the problem drinker, as cunning, baffling and powerful. In effect, the same dynamic was becoming part of *Bill's* DNA and it was fiercely progressive. He simply could not stop the purchasing of things (all kinds of things as outlined in THE GRAND JURY CHARGES) and he got a true *rush* and *high* from buying and accumulating items. Very telling in all this was the feeling of satisfaction, even joy he felt, by purchasing many gifts for his wife and children, however distorted and illegal the charges amounted to. Afterall, *Bill* was known for taking care of others but as time went on, and mostly unbeknownst to him since his *shopaholic illness* was largely unconscious, *Bill* just could not stop and because of his job and how good he was at it, the temptation was always right in front of him to carry out the shopping sprees over and over again. He became an addict, obsessed with acquiring more and more and underscored by very poor impulse control.

*Bill* still, at times, experiences the obsession to buy things he absolutely doesn't need. The geographic move to Pittsburgh this past year has been helpful which included a brief stint working at a Home Depot in merchandising where he received rave reviews (he was terminated when someone undermined him by disclosing his past behavior after "googling" him but *Bill* took it like a man and while employed put his best foot forward displaying the strong work ethic he always had). Without question, he has benefitted greatly from the change of scenery, away from Staten Island, and being closer to his wife's extended family in western Pennsylvania is just better for his psychological well-being. His wife *Janelle*, after being let go from an executive position at Fed - Ex after the company discovered *Bill's* alleged criminal history, landed a very good job with a Human Resources Consulting enterprise (DDI) with its HQ based in Pittsburgh.

As well, *Bill* getting involved in 12 step programs (Shopaholic Anonymous and Recoveries Anonymous) and psychotherapy counseling, at the suggestion of author of this mitigation report, has been very helpful to *Bill*; he knows he must keep his addiction at bay one day at a time for the rest of his life. In this past year, he has become a better, more loving husband and father and he has learned to accept himself for who is his. He has learned humility and accepts that there are consequences for his actions, especially those that are wrong. His willingness to change and be a better man is palpable. *Bill* still has a tendency to become anxious which could be evaluated for an appropriate psychotropic medication to complement his 12 step meetings and counseling. *Bill* is not suicidal nor homicidal; he does not experience any delusions, hallucinations or other psychotic symptoms. There are no serious medical, physical concerns. He has had a history of exercising poor judgement with the misuse of government funds to benefit himself; he knows he was wrong and demonstrates appropriate insight and remorse. There is no inappropriate use of alcohol and/or illicit drugs. For many years, *Bill* struggled with a poor self-image due to his traumatic background. He carried the shame felt into adulthood and this contributed to the criminal behavior. Deep down, he was experiencing an insatiable desire to be liked and accepted by all which was driven by fear: fear of isolation, fear of paralyzing anxiety (panic attacks), fear of success and even fear of being caught by the authorities for stealing, of the fraudulent charges, however unconscious this feeling of fear was most of the time.

From a psychological vantage point, **fear** is driven from deep shame and it becomes the driving force whereby emotional dysfunction simply needs a release and *Bill* found his with the excessive purchase of material goods through inappropriate criminal means. He is an addict who thrived in a job that gave him easy access to milk the system, even if he wasn't completely aware of just what he was doing. The addict, until he/she hits a bottom is simply not fully cognizant of what is really going on.

_____

**DSM – 5**

**PRIMARY DIAGNOSIS:**

**Obsessive – Compulsive Disorder 300.02 (F 42)**

Presence of obsessions, compulsions, or both.

In *Bill's* situation and psychological presentation, he is best defined on the obsessive track. He experiences recurrent and persistent thoughts, urges, or images that are experienced, at some time during the disturbance, as intrusive and unwanted, and causes him **marked anxiety and distress**. He attempts to ignore or suppress such thoughts, urges, or images, or to neutralize them with some other thought or action. For *Bill,* his response to the obsessive thoughts was always to perform a compulsion; namely: to buy, purchase over and over again and rack up as much as seemed needed and/or believed warranted without any real clear thought or reason. Justification came with the

suppression of the anxiety, lifted by the rush and the high experienced from the excessive buying of goods for himself or others and on another's (the company's) dime.

**SECONDARY DIAGNOSIS:**

**995.54 (T74.12XD) Child Physical Abuse, Confirmed /Subsequent encounter**

**995.51 (T74.32XD) Child Psychological Abuse, Confirmed /Subsequent encounter**

## POSITIVE REHABILITATIVE FACTORS

*Bill Nelson* (defendant) demonstrated to me sound and appropriate remorse for his actions associated with the crimes committed and his guilt was palpable and genuine. He believes he is better man now after being caught with his hand, literally, in the cookie jar. I believe him. While very serious, this was his first offense, and the criminal behavior I concluded stemmed from a psychological clinical picture linked to pretty severe childhood trauma. An abused young person often acts out later in life and often becomes addicted too in various ways. For *Bill*, his release of the interior pain manifested itself in a progressive addiction: shopping. To calm the anxiety and numb the unresolved effects of the trauma, Bill just kept buying and buying and doing so irrationally. I believe *Bill* feels that his arrest was the *bottom* he needed to hit and the wake-up call necessary for him to turn his life around. This turning point can change his life for the better and forever and it already has. *Bill* has become so much closer to his wife Janelle and their three children, Taylor, age 15 years, Jack, age 13 years and Sophia, age 11 years. *Bill* has even told them (his kids) about the possibility of spending some time behind bars; he has learned to be honest and transparent and is realizing that inner peace comes by walking this path and not keeping sick secrets any longer. That said, I do not believe that a prison stay would serve *Bill's* rehabilitation. If he was put under house arrest for a period with probation and community service, combined with the restitution he has committed to, I believe this would help him become an even more model citizen and community member. He is committed to maintaining his therapy regimen including attendance at regular 12 step meetings. *Bill* realizes he has a deep seated issue with addiction and must always put his illness ahead of anything else in his life so everything else, future work, family, friends, have the best possible chance of normalcy.

**SUMMARY & RECOMMENDATION**

In conclusion, I believe Bill Nelson's prospects for rehabilitation are very good. He has the potential to be resilient and do better with his life. He has become a much more spiritual, reflective man. What is most telling about Bill is that he has also become forgiving and much more prone to let go of resentments. This is true with the relationship with his father and the healing that has occurred between them is quite admirable and so right. *Bill* has the unwavering support of his entire family as he prepares for the possibility of serving time. But he is more prepared than when I first met him just over a year ago. *Bill* has simply grown and matured and realized that what is most important in life are the bonds of family and friends, not material possessions. He is tremendously grateful for being represented legally by Mr. Brackley with such dignity and recognition of his self-worth. I believe *Bill* will always be a law abiding citizen going forward and will carry himself well and in appropriate fashion as a loving husband, father, son, brother, uncle, cousin, friend, and future employee. He is in a better place emotionally, not out of the woods with his anxiety and addictive personality but he is more free of the anger and the resentments (from all the abuse) that strangled him mentally for so many years and precipitated his crime.

I trust the presiding judge and court will treat Bill Nelson benevolently and issue a fair, just and humane sentence recognizing all the challenges of his upbringing, the restitution that will be issued coupled with his deep remorse, as outlined in this mitigation report.

RESPECTFULLY SUBMITTED BY: MARK J. WILLIAMS, LCSW

*[signature]*

December 13, 2018 | Far Hills, NJ