

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NR:MCM

271 Cadman Plaza East
Brooklyn, New York 11201

January 7, 2019

BY HAND DELIVERY AND ECF

The Honorable Raymond J. Dearie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. William Nelson
              Criminal Docket No. 17-394 (RJD)

Dear Judge Dearie:

      The government respectfully submits this letter in connection with the defendant William Nelson's sentencing hearing, which is scheduled for January 18, 2019. The defendant pleaded guilty to theft of government funds totaling over $441,000 for a period of nearly ten years. In his sentencing submission filed on December 14, 2018 ("Def. Ltr."), defense counsel seeks a sentence of probation. (Def. Ltr. at 1.) For the reasons that follow, including the nature and circumstances of the offense and the need for specific and general deterrence, a non-incarceratory sentence is wholly inadequate here and the Court should sentence the defendant to 30 months' imprisonment and three years of supervised release. The defendant should also be ordered to pay restitution in the amount of $441,262.30.

I.    Background

  A.  Procedural History

      On April 23, 2018, the defendant pleaded guilty to Count One of a ten-count indictment (the "Indictment") before the Honorable Magistrate Judge Cheryl L. Pollak. (See Presentence Investigation Report ("PSR") ¶ 1.) Count One of the Indictment charged that between July 2012 and December 2016, the defendant, an agent of the Richmond County District Attorney's Office (the "RCDA"), an agency of the local government which receives benefits from federal programs in excess of $10,000, knowingly and intentionally embezzled, stole, obtained by fraud, misapplied and otherwise without authority knowingly converted to

the use of a person other than the rightful owner funds paid by the City of New York to American Express ("AMEX") for unauthorized expenditures made by the defendant using one or more RCDA AMEX credit cards (collectively, the "AMEX Cards"), in violation of 18 U.S.C. § 666(a)(1)(A). (Id.) The defendant was also charged with nine counts of mail fraud, in violation of 18 U.S.C. § 1341. (Indictment ¶¶ 25-27.)

B. Circumstances of the Charged Offense

The defendant was employed by the City of New York for over twenty years. He joined the RCDA, a government agency responsible for investigating and prosecuting state and local criminal offenses in the borough of Staten Island, New York, as the Procurement Director in approximately June 2005. (PSR ¶ 4-5.) The defendant's role as head of the RCDA Procurement Department involved various fiscal responsibilities, including, but not limited to, the purchase of goods and services for the RCDA using two AMEX Cards issued to the RCDA. (Id. ¶ 5.) As part of NELSON's duties, he was responsible for the reconciliation of the AMEX Cards' bills and approval of payments to American Express for purchases made using the AMEX Cards. (Id.)

The investigation by the Federal Bureau of Investigation and the New York City Department of Investigation revealed that between at least 2006 and 2016, the defendant fraudulently used the AMEX Cards to make numerous purchases that did not constitute legitimate RCDA business expenditures, but instead were for his own personal benefit or for the benefit of others. (Id. ¶ 7.) Using the RCDA AMEX Cards, the defendant made $441,262.30 in fraudulent charges; he purchased designer jewelry and apparel, toys, sporting goods and memorabilia, alcohol, video games and movies, electronics, household items, grocery items, books, sundries, knives, survival gear, handbags, collectibles, souvenirs, and event tickets. (Id.) The defendant also used the AMEX Cards to purchase several categories of services and intangible items, such as meals, lodging, airfare, excursions, and online services. (Id.) For example, the defendant made purchases of over $99,000 using the RCDA Amazon account. (Id.) In addition, between February 2010 and November 2016, the defendant spent approximately $160,000 in funds from the AMEX Cards via a PayPal account registered in his name. (Id.) He used the PayPal Account to pay for personal expenditures and transferred approximately $22,000 directly from the AMEX Cards to his PayPal account. (Id.) The defendant also transferred at least $12,000 of these funds from the PayPal account into his own personal bank account. (Id.)

To avoid detection of his ongoing unauthorized use of the RCDA AMEX Cards, as well as his well as his embezzlement of RCDA funds, the defendant made misrepresentations of fact and engaged in conduct aimed at concealing his scheme to defraud. (Id. ¶ 8.) He had the AMEX Cards' statements, which contained the itemized purchases made with the AMEX Cards, sent only to his RCDA email address. (Id.) The defendant also intentionally failed to provide the itemized statements related to the AMEX Cards as supporting documentation for requests for payment to AMEX. (Id.) The defendant also used a case-related billing code to conceal his purchases. (Id.) In doing so, the defendant understood that use of this particular billing object code would avoid review and

2

oversight of the fraudulent charges. (Id.) To further conceal his actions, the defendant did not file the itemized AMEX Cards' statements in the designated location for vendor invoices. (Id.) In addition, the defendant used his approval authority to approve his own fraudulent expenditures.

### C. Advisory Guidelines Range

The Probation Department calculates the defendant's advisory United States Sentencing Guideline ("Guidelines") or ("U.S.S.G.") range of imprisonment as follows:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)) | 6 |
| Loss Amount (U.S.S.G. § 2B1.1(b)(1)(G)) | +12 |
| Adjustment for Role in the Offense (U.S.S.G. § 3B1.3 (Abuse of Position of Public Trust)) | +2 |
| Acceptance of Responsibility (U.S.S.G. § 3E3.1(a) and (b)) | -3 |
| Total Offense Level: | **17** |

(PSR ¶¶ 14-23.) Based upon a total offense level of 17 and a Criminal History Category of I, the applicable advisory Guidelines range of imprisonment is 24 to 30 months' imprisonment and the supervised release range is one to three years. (PSR ¶¶ 14-27, 57-59.) The parties agree with the advisory Guidelines range set forth in the PSR.[1]

## II.   Legal Standard

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

---

[1] The defendant's plea agreement estimates the adjusted offense level is 18 because it estimated the base offense level was 7, resulting in an estimated Guidelines range of 27 – 33 months' imprisonment assuming the defendant has a Criminal History Category of I. The government, however, agrees with Probation's assessment that the base offense level for Count One is 6.

3

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

III.     Argument

The government submits that a consideration of the § 3553(a) factors recommends a top-of-the-Guidelines sentence of 30 months' imprisonment, particularly given the nature and circumstances of the offense and the need for specific and general deterrence.

   A.    Nature and Circumstances of the Offense

For ten years, the defendant abused his position of trust as an employee and supervisor of the RCDA in order to commit serious crimes.  Specifically, the defendant stole and then spent nearly half a million dollars of public funds on lavish vacations, designer clothing and jewelry, goods and services.  According to the defendant, he did so because of "'stupidity'" and "'ease of access'" when he was given access to the RCDA Amazon account.  (PSR 9.)  In sum, the defendant violated his employer's trust and that of the public for his own selfish purposes.

The defendant's conduct was egregious.  He stole hundreds of thousands of dollars, making even his children a party to the criminal conduct by using the AMEX Cards at times to, for example, pay for extravagant family vacations.  Further, during the duration of the defendant's decade-long embezzlement, he showed no remorse for his actions, stopping his criminal conduct only after he was demoted from his position and no longer had the same access to the RCDA's finances.  Indeed, far from expressing remorse, the defendant flagrantly displayed his ill-gotten gains via social media in audacious fashion.

For example, the defendant spent approximately $59,000 on flight and other vacation expenses for at least sixteen domestic and international trips to luxury hotels, resorts and spas in each of the years between 2012 and 2016.  Not only did the defendant use the RCDA AMEX Cards to cover the expense of these extravagant trips, but he blatantly posted photographs and commented on his escapades online.  For example, among other occasions, on or about August 14, 2015, the defendant posted a photograph on his Instagram page depicting a picturesque view of sunrise at the Lansdowne golf course with the comment:

4

> Sunrise. Getting ready for our morning tee time @lansdownegolf #lansdownegolfresort #golf #sunrise #goodlife #thegoodlife #living #living the dream

(Attachment 1.)[2]  In response to the defendant's post, a representative of the Landsdowne Resort posted a comment on the defendant's page to ask whether the Resort could repost the photograph on the resort's Instagram page ("lansdowneresort: Great shot @bill510c – mind if we repost it one of these days? Will credit you of course"), to which the defendant enthusiastically responded, "Thank you and yes, I would be honored."

In addition, on or about August 12, 2016, the defendant posted a picture of a golf course at Disney World to his Instagram account, stating that he was in Florida, and commenting that he was "doing Disney for a few days" in response to comments on the post. Alongside the photograph, the defendant wrote:

> Not a bad way to spend a Friday morning in Florida . . . better than being in the office. #golf #disney #disneyworld #disneygolf #disneymagnolia #disneymagnoliagolfcourse #disneygoflfing #livingthedream #onlythebest

(Attachment 2.)

Moreover, on or about July 11, 2016, the defendant again shamelessly posted a photograph depicting himself relaxing at the Lansdowne resort, cigar in hand. On the post, the defendant commented:

> Beautiful perfect morning for a quick 9 with my boys and a great cigar. #golf #golfandcigars #cigarsnob #cigars #cigaro #lansdownegolf #lansdownegolfresort #thegoodlife #onlythebest #livingthedream

(Attachment 3.)

On yet another occasion, the defendant posted a photograph of himself on his Instagram page at the Sagamore Resort with a drink in hand, commenting:

> Happy hour poolside. #happybirthday #happyhour #Lake George #thesagamoreresort #thebest #the life #thelifestyle #living large

(Attachment 4.)

---

[2] A redacted version of all attachments have been filed on ECF to preserve the privacy of third parties; the government has provided the Court with unredacted versions of the attachments.

In addition to travel expenses, the defendant also used the RCDA AMEX Cards to purchase over $100,000 in collectors' knives. As with his other illicit purchases, the defendant brashly posted his ill-gotten wares on his social media pages. For example, after his attendance at a knife collector's convention called the Blade Show in 2015, on or about June 10, 2015, the defendant posted a photograph of some of the knives that he purchased using the RCDA AMEX Cards, commenting:

> Two I picked up at Blade Show, both in ironwood, both been in my pocket since then. #jarrettflemingknives #customknives #knifeporn #knives #knifestagram #badassknives #handmadeknives #bladeforums #bladecommunity #bladeporn #knifecommunity #knifecollector #fiddlebackforge #wasknives

(Attachment 5.) On or about June 7, 2016, the defendant posted a photograph of a knife he apparently purchased at the 2016 Blade Show to his Instagram page. The post also included a comment, which read:

> One of my scores from Blade Show 2016. I had the pleasure of meeting and buying this working masterpiece from a talented, young knifemaker and blacksmith @hoffmanblacksmithing. #bladeshow #bladeshow2016 #blade #bladecommunity #knives #knivesofinstagram #knifeporn #knifenut #knifecommunity #knifecollector #handmade #handmadeknives #customknives #bladeforums #onlythebest

(Attachment 6.)

The defendant also illegally used the RCDA AMEX Cards to purchase more than $13,800 in tickets to sporting events, which he attended with his friends and family. For example, he used one of the RCDA AMEX Cards to charge over $3,000 to attend the Pittsburgh Steelers versus Cincinnati Bengals game on or about December 28, 2014, at Heinz Stadium in Pittsburg, Pennsylvania. While at the game, he posted a picture of himself and five others on his Facebook page. (Attachment 6.) In November 2015, the defendant also charged over $7,000 to one of the RCDA AMEX Cards to purchase premium Coaches Club tickets to the November 15, 2015 New York Giants versus New England Patriots football game at MetLife Stadium in East Rutherford, New Jersey. Coaches Club tickets at Metlife Stadium include admission to the game, as well as food, beverages and special access to the post-game interview room and other special amenities.

In stealing law enforcement resources for his own purposes, the defendant also victimized the hardworking men and women helping to serve the public at the RCDA. With his actions, for years he undermined the RCDA's various investigations by stealing funds that could otherwise have been used to support the mandate of the prosecutor's office – to protect the public through the prosecution of crimes. While relationships with the public and reputations may be rebuilt, the defendant's actions no doubt has and will contribute to public skepticism about internal abuse of public funds by government agencies. This affects all

employees of the RCDA. He also made unwitting accomplices of his colleagues by directing them to unknowingly help him carry out his scheme to defraud. For example, as discussed above, in order to conceal his conduct, at times he instructed his subordinates to assign the incorrect billing object code to the fraudulent charges prior to reimbursement.

For all of these reasons, the nature and circumstances of the offense militate in favor of a custodial sentence at the top of the Guidelines range.

B.   History and Characteristics of the Defendant

During most of the duration of the defendant's criminal conduct, he was working in a steady position as the Director of the Procurement Department at the RCDA. (PSR ¶ 5.) He is educated, with some college experience and owns a home. (PSR at 2; ¶ 38) He, his wife and his children enjoy good health. (PSR ¶¶ 35-36, 40.) He was raised in a middle-income household and attended Catholic School and experienced "'a very good' childhood." (Id. ¶ 34.)

Over the course of ten years, the defendant continually engaged in behavior that ran directly counter to his duties. He abused the trust that was placed in him as a department supervisor at the RCDA by misappropriating resources, lying to colleagues, and taking advantage of his subordinates. Each time he made an unauthorized purchase, approved the credit card statements for reimbursement of these purchases, represented to a vendor that he was authorized to make a purchase, and lied to a colleague to conceal his conduct, the defendant made a conscious decision to commit another crime. Indeed, had he remained in his director position, there is little doubt that he would have continued committing these crimes while at the RCDA. This is longstanding conduct which is not aberrational and not excused by a desire to "do for his loved ones."

Defense counsel, in his submission, asserts that the defendant sought only "instant gratification with the best of intentions" and his "desire to do for his loved ones cannot be questioned." (Def. Ltr. at 2.) This claim is unavailing. The defendant did not steal over $441,000 in order to, for example, put food on his table for his family or to cover emergency medical expenses; rather, he committed his crimes to have, in his own words "#onlythebest" and to continue "#livinglarge." This conduct displays one thing without question – an all-consuming greed.

Defense counsel further states that what the defendant "must be blamed for is his willful blindness to the collateral damage" that his crimes would do to his family" and asks the court to consider these collateral effects in imposing a non-incarceratory sentence. (Def. Ltr. at 2.) While the government is not blind to the affect that incarceration has on a defendant's family, this is an unfortunate consequence of criminal conduct by all defendants, particularly those with children. Here, however, there is no basis to believe that the defendant's incarceration will have an extraordinary effect on the well-being of the defendant's family such that it would warrant probation. The defendant's wife is college educated, has been employed in the past, is seeking employment (PSR ¶ 35, 36) and is,

arguably, more employable than the defendant given the defendant's criminal history. In addition, the defendant's wife advised Probation that "the defendant's parents will help financially." (Id. ¶ 37); (see also Williams Report at 9 (the defendant has "the unwavering support of his entire family as he prepares for the possibility of serving time"").)

Finally, in support of his request for a sentence of probation, the defendant has filed a mitigation report prepared by Mark J. Williams, LCSW. In his report, Mr. Williams states that the defendant's criminal conduct "stemmed from a psychological clinical picture linked to pretty severe childhood trauma." (Williams Report at 9.) Specifically, Mr. Williams states that the defendant grew up in a "very dysfunctional family system where physical and emotional abuse were commonplace." (Id. at 5.)

As a preliminary matter, the defendant's reliance on Mr. Williams' report comes at the eleventh hour with no notice, providing the government little opportunity to seek its own evaluation of Mr. Williams' findings. Notwithstanding, a plain reading of Mr. Williams' report in light of other evidence available to the Court suggests that Mr. Williams' findings appear to be inconsistent with such evidence, as well as internally inconsistent, and, therefore, do not present facts warranting a non-custodial sentence. Significantly, it is difficult to reconcile Mr. Williams' representations of the defendant's purported severely traumatic upbringing with those of the defendant, the defendant's wife and defense counsel. For example, the defendant informed Probation that he "enjoys 'wonderful' relationships with his parents" and "they are aware of his conviction for the instant offense and remain supportive." (PSR ¶ 32.) He indicated that he had a similarly "'wonderful'" and "'supportive'" relationship with his two siblings. (Id. ¶ 33.) The defendant further advised Probation that "he had 'a very good' childhood" and lived with his parents, both of whom were consistently employed by the Department of Education, into his mid-twenties and again in his late twenties after living with a girlfriend for a few years. (Id. ¶ 32, 34.) In addition, defense counsel in his sentencing submission writes that "Mr. Nelson was provided a sound upbringing with good values by hard-working middle class parents who sacrificed significantly to provide him and his siblings a Catholic school education." (Def. Ltr. at 2.) These descriptions appear to be a far cry from the "severe childhood trauma" and "dysfunctional family system" indicated in Mr. Williams' report (Williams Report at 5). In any event, Mr. Williams stated in his report that the defendant "does not experience severe, debilitating psychological dysfunction." (Id. at 6.) Accordingly, there does not appear to be any basis for the Court to impose a below Guidelines sentence, let alone a non-custodial sentence.

    C.    Deterrence, Seriousness of the Offense, Promote Respect for the Law and Providing Just Punishment

A sentence of 30 months' imprisonment is also warranted to deter the defendant and others, particularly those entrusted with roles at law enforcement agencies, from committing similar crimes. The defendant's sentence should reflect the seriousness of his crimes such that he is adequately deterred from engaging in similar conduct in the future and sufficiently punished for the harm that he has caused. Those who steal and compromise

the resources of the public for their own selfish benefit must fear that they will be adequately punished if caught. As set forth above, the defendant's conduct will have long-lasting consequences to the RCDA and clearly affects the trust that the public has that public funds are being used in the public interest. Such a sentence will also promote respect for the law by demonstrating that no one, particularly those held in the public's trust, are above being held accountable for their actions.

IV. <u>Conclusion</u>

Based on the foregoing, the government respectfully requests that the Court reject the defendant's request for probation and impose a top-of-the-Guidelines sentence of 30 months' imprisonment, three years of supervised release and restitution in the amount of $441,262.30.

           Respectfully submitted,

           RICHARD P. DONOGHUE
           United States Attorney

       By:  /s/_____
          Maria Cruz Melendez
          Assistant U.S. Attorneys
          718-254-6408

Encl.

cc:  Clerk of the Court (RJD) (by hand and ECF)
   Defense counsel (by ECF)